[FOR PUBLICATION]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | HON. JEROME B. SIMANDLE |
| | : | |
| | : | Criminal No. 05-306 (JBS) |
| v. | : | |
| | : | |
| | : | **OPINION** |
| WAYNE MORUZIN, | : | |
| | : | |
| Defendant. | : | |

APPEARANCES:

CHRISTOPHER J. CHRISTIE
United States Attorney
By:  Norman J. Gross,
     Assistant United States Attorney
     Ronald Chillemi,
     Assistant United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey  08101

MARK W. CATANZARO, Esq.
Blason IV - Suite 208
513 S. Lenola Road
Moorestown, NJ 08057
     Attorney for Defendant Wayne Moruzin

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

This matter is before the Court upon the Government's motion
for the involuntary administration of antipsychotic medication to
Defendant Wayne Moruzin to render him competent to stand trial
[Docket Item 112].  In 2005, Defendant was indicted on charges of
bank robbery and jury tampering [Docket Items 10 and 41].  After
he began to exhibit increasingly unusual behavior in the

proceedings herein, the Court, pursuant to 18 U.S.C. § 4241(a), ordered that an evaluation of Mr. Moruzin's competency to stand trial be performed, after which the Court ultimately determined that he was suffering from a mental disease or defect that rendered him mentally incompetent to stand trial, pursuant to § 4241(d) [Docket Item 91].  The Court ordered that Defendant be committed to the custody of the Attorney General for hospitalization and treatment, and directed the treatment facility to assess the likelihood of whether he would regain his mental competence so as to permit the trial to proceed [Docket Item 92].

After the resulting competency restoration study was produced, the Government filed the motion presently before the Court.  The Government argues, pursuant to <u>Sell v. United States</u>, 539 U.S. 166 (2003), that the Court should order that Mr. Moruzin be involuntarily administered antipsychotic medication in order to restore him to competency.  Defendant opposes the Government's motion, arguing that the Government has failed to satisfy its burden under <u>Sell</u> of establishing that the forced administration of such medication is necessary and appropriate in this case. For the reasons set forth below, the Court will deny the Government's motion.

## II.   BACKGROUND

### A.   Underlying Criminal Charges

On April 26, 2005, a grand jury returned a one-count indictment, charging Mr. Moruzin with bank robbery in violation of 18 U.S.C. §§ 2113(a) and 2 [Docket Item 10].  According to the indictment, on September 15, 2004, Mr. Moruzin robbed the First Colonial National Bank in Westville, New Jersey of approximately $11,588.00.  On October 10, 2005, Mr. Moruzin wrote and mailed to a woman named Carolyn LeFever a letter in which he suggested that Ms. LeFever appear at jury selection for his upcoming criminal trial and inform the potential jurors that Mr. Moruzin had been "set up."  After the letter was intercepted, a grand jury returned a two-count superseding indictment, charging Mr. Moruzin with bank robbery and jury tampering [Docket Item 41].

### B.   Competency Evaluation

Initially, Mr. Moruzin, intent on representing himself in this criminal action, filed an application seeking to waive his right to counsel, which, after convening a hearing and finding "that Defendant's waiver of counsel [was] knowing, voluntary, and intelligent," the Court granted in an Order dated October 18, 2005 [Docket Item 40].  On April 7, 2006, however, after Defendant began to exhibit increasingly unusual behavior, the Court determined that there was "reasonable cause to believe that the defendant may presently be suffering from a mental disease or

3

defect rendering him mentally incompetent," under 18 U.S.C. § 4241(a), and ordered that an evaluation of Mr. Moruzin's mental competency be performed [Docket Item 76].[1]

The results of the competency evaluation were memorialized in a forensic report dated August 7, 2006.  Dr. Judith (Betsy) Campbell, Ph.D., the Bureau of Prisons forensic psychologist who evaluated Defendant and authored the forensic report, diagnosed Mr. Moruzin with bipolar II disorder with psychotic features.[2] (Docket Item 91 at 11.)  Following the issuance of the forensic report, the Court convened a competency hearing on October 5, 2006 pursuant to section 4241(d), at which Defendant was represented by counsel and at which the Court heard the testimony of Dr. Campbell.

Based on the forensic report and the evidence presented at the October 5 hearing, the Court found, in an Opinion and Order

---

[1] Additionally, by Order dated September 7, 2006 [Docket Item 81], the Court revoked Defendant's pro se status pending the results of the competency evaluation and restored Mark Catanzaro, Esq., as full counsel for Defendant in this action.

[2] Specifically, Dr. Campbell rendered the following diagnosis:

Axis I:   296.89 - Bipolar II Disorder, Moderate, with Psychotic Features

304.80 Polysubstance Dependence.

Axis II:  301.90 Personality Disorder Not Otherwise Specified (NOS), with Narcissistic, Paranoid, and Antisocial Features.

(Docket Item 91 at 11.)

dated October 19, 2006 [Docket Items 91 and 92], that Mr. Moruzin was mentally incompetent to assist properly in his own defense or to defend himself.   The Court explained:

> The vast preponderance of evidence leads to the conclusion that Mr. Moruzin, due to a severe mental disease, is presently mentally incompetent because he is unable to properly assist in his defense . . . . Mr. Moruzin's paranoid and delusional thinking . . . impairs his functioning so severely that his perceptions of this process are too often irrational.   Although Mr. Moruzin displays moments of lucidity in court and speaks of various defense tactics, he is much more often agitated, suspicious, and non-comprehending of the procedures and the intentions of those around him.   He presently seems to be unable to have a constructive dialog about this case or his defense due to his hostility and paranoia, and there is little doubt that his unfounded mistrust of his attorney and his attorney's motives hampers his attorney-client relationship.

(Docket Item 91 at 12-13.)   The Court accordingly ordered that Mr. Moruzin be "committed to the custody of the Attorney General for hospitalization and treatment in a suitable facility pursuant to 18 U.S.C. § 4241(d)," and ordered that within 120 days, the director of that facility "report to the Court whether there is a substantial probability that, in the foreseeable future from that date, Defendant will attain the capacity to permit the trial to proceed, as required by 18 U.S.C. § 4241(d)(1)."   (Docket Item 92 at 2.)

###   C.   Forensic Evaluation at FMC Butner

Pursuant to the Court's Order, Mr. Moruzin was transferred to the Federal Medical Center in Butner, North Carolina ("FMC Butner") for treatment.   At FMC Butner, Defendant was evaluated

by members of the institution's mental health staff, including
Dr. Angela Walden-Weaver, Ph.D., who served as his treating
psychologist, and Dr. Robert Lucking, M.D., who served as
consulting psychiatrist; Drs. Walden-Weaver and Lucking
subsequently produced a forensic evaluation (the "Butner Report"
or "Report") addressing Mr. Moruzin's psychological diagnosis,
his competency to stand trial, and the prospects for Mr. Moruzin
to attain competency with or without the assistance of
medication.  (Gov't's Br. Ex. B at 2.)

In the Butner Report, Drs. Walden-Weaver and Lucking – after
reviewing Mr. Moruzin's extensive history of legal, substance
abuse, and psychological problems – render the following
diagnoses according to the criteria contained in the American
Psychiatric Association's Diagnostic and Statistical Manual of
Mental Disorders, Fourth Edition ("DSM IV"):

Axis I:     Bipolar II Disorder, Severe with Psychotic
            Features, 296.89 (Principal Diagnosis)

            Polysubstance Dependence, 304.80

Axis II:    Diagnosis Deferred, 799.9

Axis III:   Chronic Low Back Pain

            Seizure Disorder by History

            Past Infection with Hepatitis B And Hepatitis
            A

            Hepatitis C Antibody Positive

Axis IV:    Problems Related to Interaction with the Legal
            System/Crime

6

> Axis V:   Global   Assessment   of   Functioning   = 41
>             (current)[.]

(Id. at 9.)  The Report indicates that Mr. Moruzin, who is fifty-three years old, has suffered from mental illness "[f]or at least the past 32 years," and that his "psychotic symptoms are chronic and persistent."  (Id. at 9, 14.)  On the matter of Mr. Moruzin's competency, Drs. Walden-Weaver and Lucking, like Dr. Campbell, opine that Mr. Moruzin is unable to assist in his defense on account of his delusional belief that his attorney, the Government, and the Court are conspiring against him.  (Id. at 11.)

With regard to the question of "whether there is a substantial probability that in the foreseeable future [Mr. Moruzin] will attain the capacity to permit the proceedings to go forward," 18 U.S.C. § 4241, the Butner Report indicates that "Mr. Moruzin is unlikely to improve in the foreseeable future without treatment with antipsychotic medication, which he is now refusing on a voluntary basis."  (Id. at 14.)  Drs. Walden-Weaver and Lucking accordingly request that the Court order that Mr. Moruzin be involuntarily administered antipsychotic medication in order to restore him to competency.  (Id. at 12.)  The Report prefaces this request with a recognition that

> [b]ecause he can be safely managed in a secure mental
> health unit; generally maintain adequate personal hygiene
> and  room  sanitation;  maintain  practices  of  adequate
> nutritional  intake;  and  is  not  overtly  threatening  to
> himself, others, or property, [Mr. Moruzin] does not meet

7

[the] criteria for involuntary treatment pursuant to
Washington v. Harper[, 494 U.S. 210 (1990)].

(Id. at 12.)

Instead, the Report urges the Court to order the involuntary
administration of antipsychotic medication to Mr. Moruzin
pursuant to Sell v. United States, which "permit[s] involuntary
administration of drugs solely for trial competence purposes in
certain instances."  539 U.S. at 180.  According to the Butner
Report, while the absence of information available regarding Mr.
Moruzin's medication history meant that Dr. Lucking[3] had "no
established pattern of response to antipsychotic medication upon
which to base a current opinion of his response to [such]
medication," it is likely, but not certain, that the
administration of antipsychotic drugs would render Mr. Moruzin
competent to stand trial.  (Gov't's Br. Ex. B at 14.)  As the
Report indicates, the American Psychiatric Association ("APA")
guidelines show that "10% to 30% of patients will have little or
no response to antipsychotic medications, and an additional 30%
of patients have a partial response to treatment.  Patients with
their first episode of psychosis are more responsive to treatment
than multi-episode patients."  (Id. at 13.)  Because even a

───────────────

[3]  According to his testimony before the Court on June 2,
2008, Dr. Lucking alone authored the sections of the Butner
Report that address the prospects that the administration of
antipsychotic medication will restore Mr. Moruzin to competency.
(Tr. at 34.)

partial response to treatment can result in the restoration of competency, and because antipsychotic medications target the very symptoms that render Mr. Moruzin incompetent to stand trial, the Butner Report indicates that there is a "substantial probability" that the administration of such medications to Mr. Moruzin will restore his competency to stand trial.  (Id. at 14.)

Noting that the administration of such medication is the "standard and accepted treatment" for a patient with Defendant's diagnosis, the Report states that the proposed treatment is "medically and clinically appropriate."[4]  (Id. at 15.)  Without listing specific side effects or the likelihood that the proposed treatment would cause Mr. Moruzin to experience such side effects, the Report suggests that "the proposed treatment would be substantially unlikely to have serious side effects which would interfere significantly with his ability to assist his attorney in preparing and conducting his defense."  (Id.)  The Report further states that if Mr. Moruzin experiences these unspecified side effects, they could be "managed in a clinically appropriate manner."  (Id.)

---

[4]  The Butner Report further notes that in light of the chronic and persistent nature of his illness, Mr. Moruzin's condition is unlikely to improve in the absence of treatment with antipsychotic medication.  (Gov't's Br. Ex. B at 14.)  The Report specifically addresses the inadequacy of psychotherapy as a substitute for antipsychotic drugs, explaining that psychotherapy may operate as an adjunct to medication, but that there "is no evidence that psychotherapeutic techniques alone are effective alternatives for antipsychotic agents."  (Id. at 14-15.)

D.  __Sell__ **Application and Hearings**

Following the submission of the Butner Report, the
Government moved, pursuant to Sell, for an order authorizing the
involuntary administration of antipsychotic medication in order
to render Mr. Moruzin competent to stand trial [Docket Item
112].[5]  The Court convened a series of lengthy hearings on May
20, 2008, June 2, 2008 June 12, 2008, and August 5, 2008, at
which the Government and Mr. Moruzin presented the testimony of
numerous witnesses on the issue of whether the involuntary
administration of medication to restore Mr. Moruzin's competency
is appropriate and necessary, including, most importantly, the
testimony of Dr. Lucking.[6]

---

[5]  In its motion, the Government originally argued that in
the alternative, Mr. Moruzin should be administered antipsychotic
drugs pursuant to Washington v. Harper, 494 U.S. 210 (1990),
which held that "[t]he Due Process Clause permits the State to
treat a prison inmate who has a serious mental illness with
antipsychotic drugs against his will, if he is dangerous to
himself or others and the treatment is in his medical interest."
494 U.S. at 226.  The Government argued that while Mr. Moruzin
"has not yet assaulted anyone since his incarceration in this
case, he has expressly threatened to do so on at least two
occasions, and has elliptically threatened to engage in
unspecified crimes of violence several other times."  (Gov't. Br.
at 11.)  The Government has since withdrawn the portion of its
motion requesting the administration of antipsychotic medication
under Washington v. Harper's dangerousness rationale.

[6]  The Court likewise heard testimony from Mr. Moruzin's
treating psychologist, Dr. Walden-Weaver.  On the matters at
issue in the present motion, Dr. Walden-Weaver deferred to Dr.
Lucking entirely.

The Court heard testimony from Dr. Lucking[7] at a hearing convened on June 2, 2008.[8]  On the matter of Mr. Moruzin's diagnosis and competency to stand trial, Dr. Lucking testified that Mr. Moruzin suffers from "reality-distorting experiences such as hallucinations and delusions" as a result of bipolar II disorder with psychotic features.  (Tr. at 22.)  Of Mr. Moruzin's psychotic symptoms, Dr. Lucking testified that it is his "significant paranoia which prevents him from being competent." (Id. at 23.)  When questioned about what role Mr. Moruzin's bipolar disorder, as distinct from his paranoia, played in rendering him incompetent, Dr. Lucking testified that it was "difficult to determine at this point in time," and that "[o]nly when the paranoia is treated will we be able to see what effect,

_____

[7]  Dr. Lucking, who evaluated Mr. Moruzin and co-authored the Butner Report, has practiced psychiatric medicine for approximately thirty years and concentrates his current practice on competency restoration.  (Tr. at 7-19, 33-35.)

[8]  In an Opinion and Order entered on October 1, 2007 [Docket Items 135 and 137], the Court permitted Dr. Lucking to testify from FMC Butner via video-conference at the June 2, 2008 Sell hearing due to "the fact that he has a medical condition that does not permit him to travel and that significantly inhibits his capacity to testify in court."  United States v. Moruzin, No. 05-306, 2007 WL 2914903, (D.N.J. Oct. 1, 2007).  The Court determined that "the minimal risk that Moruzin's interest in robust cross-examination would be compromised as a result of the procedure leads inevitably to the conclusion that the use of video-conference to permit Dr. Lucking's testimony at the Sell hearing does not run afoul of the defendant's due process rights."  Id. at *7.  After Dr. Lucking testified via video-conference, Mr. Catanzaro, Defendant's attorney, confirmed that he had been able to effectively cross-examine Dr. Lucking at the hearing.  (Tr. at 129.)

if any, that is having." (Id. at 31.)  Dr. Lucking opined that,
as a general proposition, a person could suffer from bipolar II
disorder and still be competent to stand trial. (Id.)

According to Dr. Lucking's testimony, the administration of
antipsychotic medication is the "generally accepted treatment for
psychotic symptoms" like Mr. Moruzin's. (Id. at 27.)  While Dr.
Lucking testified that approximately twenty antipsychotic drugs
exist, and that each of these medications is administered through
different means (e.g., orally or through injections), a patient's
refusal to take the drugs voluntarily narrows the range of
treatment options down to three long-acting injectable agents:
Haloperidol Deconate ("Haldol"), Luphenazine, and Risperidone.
(Id. at 27, 36.)  Of these three medications, Dr. Lucking
testified that he would prefer to treat Mr. Moruzin with Haldol,
because, as compared to Luphenazine and Risperidone, it requires
fewer injections, produces fewer side effects, and is less likely
to damage Mr. Moruzin's liver, which is compromised as a result
of his hepatitis C infection.[9] (Id. at 37-39.)

_____

[9] With regard to the dosage of Haldol that he would
prescribe Mr. Moruzin, Dr. Lucking testified that it is "an
individual thing," in that some patients respond to an initial
dose of 150 milligrams, while others require 200- or 250-
milligram doses. (Tr. at 48.)  Dr. Lucking testified that, if
authorized to treat Mr. Moruzin, he would administer an initial
dose of 150 milligrams, administer two additional doses within a
four-week period "in order to build up a blood level more
quickly," and then administer a dose once every four weeks
thereafter. (Id. at 47.)  On cross-examination, Dr. Lucking
testified that before administering the initial 150-milligram

Dr. Lucking reiterated his conclusion in the Butner Report that there is a "substantial probability" that treating Mr. Moruzin with Haldol would restore him to competency.  (Id. at 59.)  While Dr. Lucking admitted to having testified four years ago that antipsychotic medications work for only ten percent of patients with delusional disorders such as paranoia, he testified that he has since been informed of a study performed by one of his FMC Butner colleagues that puts the favorable response rate at between seventy and eighty percent.  (Id. at 75-77.)  Dr. Lucking conceded that the APA's guidelines indicate that as many as sixty percent of patients have no response, or only a partial response, to antipsychotic medications, (id. at 70), but stated that in his practice, between eighty and eighty-five percent of patients treated with Haldol have been restored to competency. (Id. at 55.)

During his direct testimony, and upon cross-examination, Dr. Lucking addressed whether certain prognostic signs particular to Mr. Moruzin rendered him more or less likely to respond to treatment with Haldol.  Dr. Lucking acknowledged that, as a general proposition, an individual who is older, with multiple episodes of psychosis, severe symptoms, and a history of drug abuse would have a poorer prognosis for restoration to competency

---

dose, he would give Mr. Moruzin a "test dose of the medication to make sure . . . [that he did not] have significant adverse reactions to it."  (Id. at 98.)

13

than would an individual without such prognostic signs, but
testified, without citing any countervailing positive prognostic
signs, that in aggregate, the prognostic signs in Mr. Moruzin's
case were collectively neutral-to-positive.[10]   (Id. at 56-59.)

Dr. Lucking also testified about the side effects caused by
Haldol, acknowledging that "[e]very medicine causes side
effects." (Id. at 39.)  According to Dr. Lucking, the most
common side effects caused by Haldol are neurological (also known
as "extrapyramidal"). (Id. at 39-40.)  The most common of these
extrapyramidal side effects are pseudo-Parkinson's-type side
effects, such as rigidity, slow movement, and a tremor.  (Id. at
42.)  Dr. Lucking acknowledged that the literature reports that
as many as fifty percent of patients who take Haldol experience
pseudo-Parkinson's-type side effects, but testified that in his
practice, he observed such effects at a rate as low as ten
percent.  (Id.)  Less common than pseudo-Parkinson's-type side
effects among patients taking Haldol is akathisia, which Dr.
Lucking described as an "inner sense of restlessness in which the
individual feels that he needs to move around constantly and
cannot sit still." (Id. at 85.)  While akathisia is reported in

---

[10]   In the Butner Report, Dr. Lucking indicated as one such
positive prognostic sign the fact that Mr. Moruzin had a positive
response to the use of antipsychotic medication in the past.
(Gov't's Br. Ex. B at 11.)  Upon cross-examination, Dr. Lucking
acknowledged that "[t]hat sentence probably is not accurate,"
since Mr. Moruzin has not previously taken antipsychotic drugs.
(Tr. at 84-85.)

the literature at a rate of twenty to thirty percent of people taking antipsychotics, (id.), Dr. Lucking likewise testified that he observed the occurrence of akathisia in as few as eight percent of his patients.  (Id. at 41.)  Dr. Lucking described pseudo-Parkinson's-type side effects and akathisia as being "easily treated."  (Id.)

Dr. Lucking also testified about the potential tardive, or permanent-appearing, side effects that can result from taking Haldol, including tardive dyskinesia.  (Id. at 87.)  Tardive dyskinesia, according to Dr. Lucking, is "characterized by repetitive, involuntary, purposeless movements," such as "grimacing, tongue protrusion, lip smacking, puckering, and pursing of the lips and rapid eye blinking."  (Id. at 89-90.) Dr. Lucking testified that in rare cases the condition can be "very severe" such that it causes "abnormal movements of the trunk, the arms, the legs[, and] . . . the diaphragm," but noted that he had only observed such severe tardive dyskinesia once in thirty years of practice.[11]  (Id. at 90.)  Approximately twenty percent of patients taking Haldol experience some form of tardive dyskinesia, for which treatment options are limited; as Dr.

---

[11]  Once again, Dr. Lucking acknowledged that the literature reports rates of severe tardive dyskinesia among Haldol patients much higher than he has allegedly experienced in his practice. (Tr. at 90.)  According to Dr. Lucking, studies suggest that of the twenty percent of Haldol patients who experience tardive dyskinesia, ten percent of those cases are severe.  (Id.)

Lucking testified, "there isn't a whole lot you can do to treat it." (<u>Id.</u>)

In his testimony, Dr. Lucking also described additional, less common side effects that patients taking Haldol may experience. One such side effect is an acute dystonic reaction, which, he explained, is a painful contraction in a muscle group in the back, neck, or shoulders, which can cause a patient's head to be turned permanently to one side. (<u>Id.</u> at 88-89.) Dr. Lucking described dystonia as a "serious emergency" and recognized that it can be life-threatening, but testified that he had only encountered acute dystonia in one case over the course of his practice. (<u>Id.</u> at 97.) An additional rare and possibly fatal side effect of Haldol to which Dr. Lucking testified is neuroleptic malignant syndrome, which one percent of Haldol-taking patients develop, and which is fatal in up to twenty percent of the cases in which the syndrome develops. (<u>Id.</u> at 94.)

Notwithstanding the risks these serious and potentially fatal side effects pose, Dr. Lucking testified that the administration of antipsychotic medication in general, and Haldol in particular in Mr. Moruzin's case, is the "generally accepted treatment for psychotic symptoms." (<u>Id.</u> at 27.) Dr. Lucking further opined that "there is no other alternative" to the administration of antipsychotic medication to address Mr.

16

Moruzin's mental illness.  (<u>Id.</u> at 64.)  Dr. Lucking specifically

discounted the appropriateness of two potential alternative

treatments, stating that psychotherapy fails to adequately

"treat[] the core symptoms of the psychotic illness . . .

[because such an illness] is a biological matter," (<u>id.</u> at 63),

and that electroshock therapy, while appropriate to treat bipolar

disorder, would not address Mr. Moruzin's psychotic symptoms.

(<u>Id.</u> at 64.)

Following the four hearings between May and August 2008, the

parties submitted supplemental briefs on the Government's <u>Sell</u>

motion.  The Court heard oral argument on the Government's motion

on October 10, 2008 and reserved decision.[12]

## III. DISCUSSION

### A.   Involuntary Administration of Medication Under <u>Sell</u>

The Supreme Court has repeatedly recognized that a defendant

"has a constitutionally protected liberty interest in avoiding

---

[12]   Three hours before the October 10, 2008 hearing (and
nearly three weeks after Defendant filed his final brief), the
Government hand-delivered to the Court a Reply Brief which cited
an article published in the Journal of the American Academy of
Psychiatry and the Law.  In its Reply Brief, the Government,
through AUSA Chillemi, inaccurately states that the article was
"noted in the report of Dr. Lucking and Walden-Weaver."  (Gov't's
Reply Br. at 3.)  Contrary to the assertion in the Government's
last-minute submission, the article in question was never
mentioned in the Butner Report, and the existence of a data
compilation was referenced only indirectly and upon cross-
examination during Dr. Lucking's testimony.  This article is not
in evidence, and will not be considered by the Court in
addressing the merits of the Government's motion.

involuntary administration of antipsychotic drugs – an interest that only an essential or overriding state interest might overcome." Sell, 539 U.S. at 178-79 (internal quotations and citations omitted); see also Washington v. Harper, 494 U.S. 210 (1990); Riggins v. Nevada, 504 U.S. 127, 134 (1992). The Court determined in Harper that such an essential interest exists where a prisoner poses a danger to himself or others. Harper, 494 U.S. at 227. As the Court explained in that case, "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id.

Such an overriding state interest may also exist "in certain instances" in which the purpose of administering antipsychotic medication is not to target a mentally ill inmate's dangerous conduct, but is instead to render "a mentally ill defendant facing serious criminal charges . . . competent to stand trial." Sell, 539 U.S. at 179-80. The Court noted that the instances in which administering antipsychotic drugs solely for trial competency purposes is appropriate "may be rare," id. at 180, and set forth four criteria that the Government must prove in order to overcome the defendant's liberty interest in being involuntarily medicated:

18

> First, a court must find that <u>important</u> governmental interests are at stake . . . . Second, the court must conclude that involuntary medication will <u>significantly further</u> those concomitant state interests.  It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial.  At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.  Third, the court must conclude that involuntary medication is <u>necessary</u> to further those interests.  The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results . . . . Fourth, . . . the court must conclude that administration of the drugs is <u>medically appropriate</u>, i.e., in the patient's best medical interest in light of his medical condition.

<u>Id.</u> at 180-81 (emphasis original, citations omitted).  The Government must prove each of these factors by clear and convincing evidence.  <u>See</u> <u>United States v. McCray</u>, 474 F. Supp. 2d 671, 676-77 (D.N.J. 2007) (citing <u>United States v. Gomes</u>, 387 F.3d 157, 160 (2d Cir 2004) and <u>United States v. Bradley</u>, 417 F.3d 1107, 1114 (10th Cir. 2005)).

Because "<u>Sell</u> orders are disfavored," <u>United States v. Rivera-Guerrero</u>, 426 F.3d 1130, 1137 (9th Cir. 2005), the Supreme Court noted that there are "strong reasons for a court to determine whether forced administration of drugs can be justified on alternative grounds," such as <u>Harper</u>'s consideration of dangerousness, "<u>before</u> turning to the trial competence question." <u>Sell</u>, 539 U.S. at 182 (emphasis in original).  As the Court explained, "a court, asked to approve forced administration of drugs for purposes of rendering a defendant competent to stand

19

trial, should ordinarily determine whether the Government seeks,
or has first sought, permission for forced administration of
drugs on these other Harper-type grounds; and, if not, why not."
Id. at 183.

   B.   **Analysis**

   Applying these considerations to the facts of this case, the
Court will deny the Government's Sell motion.  Initially, the
Court notes that while the Government first moved for the
involuntary administration of medication on both Harper and Sell
grounds, it has since withdrawn its Harper motion and focused
exclusively on its interest in rendering Defendant competent to
stand trial.  In light of the Supreme Court's recognition that,
when medication for Harper-type reasons is sought, "an inmate's
interests are adequately protected, and perhaps better served, by
allowing the decision to medicate to be made by medical
professionals rather than a judge," Harper, 494 U.S. at 231, the
Government here appears to have had a rational reason for
abandoning its Harper motion: the medical professionals in this
case concluded that Mr. Moruzin "does not meet [the] criteria for
involuntary treatment pursuant to Washington v. Harper."
(Gov't's Br. Ex. B at 12.)  "Because the Government disclaimed
any opportunity to make a showing of dangerousness under Harper,"
and appears to have had logical grounds for doing so, the Court
reviews the motion presently under consideration under Sell's

20

above-described criteria for involuntary medication of a non-
dangerous defendant.  United States v. Hernandez-Vasquez, 513
F.3d 908, 915 (9th Cir. 2008); accord United States v. Green, 532
F.3d 538, 545 n.6 (6th Cir. 2008).

      1.   Governmental Interests

     In discussing the first Sell factor, the importance of the
governmental interests at stake in the particular case, the
Supreme Court explained that although "[t]he Government's
interest in bringing to trial an individual accused of a serious
crime is important," courts "must consider the facts of the
individual case in evaluating the Government's interest in
prosecution." Sell, 539 U.S. at 180.  In particular, the Court
noted:

> Special circumstances may lessen the importance of that
> interest.  The defendant's failure to take drugs
> voluntarily, for example, may mean lengthy confinement in
> an institution for the mentally ill - and that would
> diminish the risks that ordinarily attach to freeing
> without punishment one who has committed a serious crime.
> We do not mean to suggest that civil commitment is a
> substitute for a criminal trial . . . . The potential for
> future confinement affects, but does not totally
> undermine, the strength of the need for prosecution.

Id.

     In this case, Defendant does not dispute that armed bank
robbery constitutes a serious offense.  While the Supreme Court
has offered little guidance on the question of whether a crime is
"serious" under Sell, courts within and outside this Circuit have
reasoned that "is appropriate to focus on the maximum penalty

authorized by statute in determining if a crime is 'serious' for involuntary medication purposes."  McCray, 474 F. Supp. 2d at 677 (quoting United States v. Evans, 404 F.3d 227, 237 (4th Cir. 2005)).  As the Government notes, the statutory maximum sentence for Defendant's bank robbery charge is twenty years, 18 U.S.C. § 2113(a), and the maximum sentence for Defendant's jury tampering charge is ten years.  18 U.S.C. § 1503(b)(3).  There is no mandatory minimum sentence for either charge.  Irrespective of whether Defendant's jury tampering charge alone would be considered serious under Sell, there can be no doubt that Defendant's bank robbery charge, which carries a maximum exposure of twenty years, "is 'serious' under any reasonable standard." Evans, 404 F.3d at 238 ("We think it beyond dispute that the Government does have an important interest in trying a defendant charged with a felony carrying a maximum punishment of 10 years imprisonment.").

Without diminishing the seriousness of the crimes with which Mr. Moruzin is charged, it is relevant to the motion under consideration that the Government has made clear that if its Sell motion were denied, it would move to have Mr. Moruzin civilly committed.  As the Supreme Court suggested in Sell, "the defendant's failure to take drugs voluntarily . . . may mean lengthy confinement in an institution for the mentally ill - and that would diminish the risks that ordinarily attach to freeing

22

without punishment one who has committed a serious crime." <u>Sell</u>, 539 U.S. at 180.  While, as the Butner Report appears to indicate, Mr. Moruzin "can be safely managed in a secure mental health unit" and is not, while so managed, presently a danger to himself or others, (Gov't's Br. Ex. B at 12), this is a far cry from suggesting that he <u>would</u> <u>not</u> "create a substantial risk of bodily injury to another person or serious damage to property of another" if released.  18 U.S.C. § 4246(a).  To the contrary, in light of Mr. Moruzin's psychosis, his conduct as reported over the course of the proceedings herein, and his unwillingness to take antipsychotic medication, there is every indication that Mr. Moruzin would pose such a risk upon release, even though he "can be safely managed in a secure mental health unit."  (Gov't's Br. Ex. B at 12.)

The likelihood of civil commitment, while not "a substitute for a criminal trial," thus impacts "the strength of the need for prosecution" in this case.  <u>Sell</u>, 539 U.S. at 180.  While the Government has an important interest in prosecuting Mr. Moruzin, the importance of vindicating that interest through criminal trial is tempered by the strong likelihood that Mr. Moruzin would be civilly committed for a lengthy period of time if he continues to refuse to be treated with antipsychotic drugs.

## 2.  Furthering Governmental Interests

Sell's second prong requires the Court to determine whether the administration of medication sought by the Government "will significantly further those concomitant state interests."  Id. The Court must determine whether the

> administration of the drugs is substantially likely to render the defendant competent to stand trial.  At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.  See Riggins, 504 U.S., at 142-145 (KENNEDY, J., concurring in judgment).

Id.  With respect to the likelihood that the involuntary administration of Haldol would render Mr. Moruzin competent to stand trial, the Government draws the Court's attention to Dr. Lucking's testimony that in his practice, between eighty and eighty-five percent of psychotic patients he has treated with Haldol have been restored to competency.  (Tr. at 55.)  It is acknowledged that clear and convincing evidence that the administration of Haldol would be eighty-five percent likely to restore Mr. Moruzin's competency would satisfy Sell's substantial likelihood criterion.  See McCray, 474 F. Supp. 2d at 679 (citing cases recognizing that a seventy percent chance that the defendant would be restored to competency meets the substantially likelihood standard).  However, the Court finds that Dr. Lucking's testimony on this point is insufficiently persuasive to establish by clear and convincing evidence that the

24

administration of Haldol is substantially likely to restore Mr.
Moruzin's competency to stand trial, when the particular factors
of Mr. Moruzin's mental health history are considered.

Most glaring among the deficiencies in Dr. Lucking's
testimony on this point is his discussion of prognostic signs in
Mr. Moruzin's case.  Dr. Lucking acknowledged that "in evaluating
a particular patient's likely response to treatment with
antipsychotic medication, there are certain factors that are
associated with better outcomes (i.e., positive prognostic signs)
and there are certain factors that are associated with
undesirable outcomes (i.e., negative prognostic signs)." Id. at
680.  Among the relevant prognostic indicators that Dr. Lucking
identified were: (1) a patient's age (younger individuals are
more likely to respond positively to antipsychotic medication);
(2) whether the patient has experienced previous episodes of
psychosis (patients experiencing multiple episodes of psychosis
are less likely to respond positively to medications); (3) the
length of time that the patient has been psychotic (longer
psychotic experiences correlate with poorer prognoses); (4)
whether the patient has previously responded positively to
antipsychotic medications (such patients are more likely to
respond positively to the medications); (5) a patient's history
of drug use (patients with a history of drug use respond less
positively to the medications); and (6) the severity of the

25

patient's symptoms (patients with severe symptoms are less likely to respond to the medications).  (Tr. at 56-59, 84-85.)

Each of these prognostic signs would appear to diminish the likelihood that Haldol would be effective in Mr. Moruzin's case. Mr. Moruzin is fifty-three years old, (Gov't's Br. Ex. B at 1); he has suffered from mental illness "[f]or at least the past 32 years," (id. at 9), and his psychotic symptoms have been "chronic and persistent,"[13] (id. at 14); he has not previously responded to antipsychotic medications, (Tr. at 84-85); he has abused a wide variety of drugs for the last forty years, (Gov't's Br. Ex. B at 4); and Dr. Lucking himself characterized Mr. Moruzin's psychotic symptoms as "severe."  (Id. at 9.)  Indeed, the Butner Report expressly linked the predicted "substantial probability" of Mr. Moruzin's positive response to Haldol to his previous positive response to antipsychotic medication, (Gov't's Br. Ex. B at 11), a link Dr. Lucking conceded was inaccurate because Mr. Moruzin "has not been treated previously with antipsychotic medications."  (Tr. at 85.)[14]

---

[13]  Dr. Lucking's testimony that this may be Mr. Moruzin's first episode of psychosis is belied by his own report, which notes that he exhibited psychotic features during his incarceration with the New Jersey Department of Corrections. (Gov't's Br. Ex. B at 6; Tr. at 72-73.)

[14]  The Butner Report states:

We believe there is a substantial probability Mr. Moruzin's competency can be restored with treatment with an antipsychotic medication.  This belief is based upon

Notwithstanding these negative prognostic signs, and without identifying a single countervailing positive prognostic factor, Dr. Lucking testified that the range of prognostic signs in Mr. Moruzin's case was "neutral.  Positive.  Somewhere in there." (Id. at 59.)  Dr. Lucking made no apparent effort to reconcile this profusion of negative prognostic indicators with his optimism over the likelihood that Mr. Moruzin could be restored to competency.  Without reconciling his opinion regarding the probability of the medication's effect on Mr. Moruzin with these concededly negative prognostic signs, Dr. Lucking's testimony on this point is neither clear nor convincing.  See McCray, 474 F. Supp. 2d at 680 (finding that a psychiatrist's failure to account for negative prognostic signs undermines his opinion on the efficacy of proposed treatment).  The Court accordingly finds that the Government has failed to satisfy its burden of establishing that the "administration of the drugs is

---

his past positive response to treatment with psychotropic medication, as documented earlier in this report.

(Gov't's Br. Ex. B at 11.)  After conceding that the prognostic factor upon which the opinion articulated in the Butner Report was based was negative, rather than positive, in Mr. Moruzin's case, Dr. Lucking did not waver from his opinion regarding the likelihood that the proposed treatment would succeed in restoring Mr. Moruzin to competency.  There may well be good reasons to believe that Haldol is substantially likely to restore Mr. Moruzin's competency, notwithstanding the array of negative prognostic signs here, but Dr. Lucking's testimony did not adequately address such considerations.

substantially likely to render the defendant competent to stand trial."[15]  Sell, 539 U.S. at 180.

The facts of record are likewise insufficient to satisfy the remaining considerations under Sell's second prong, which address whether the side effects of the medication are substantially unlikely to interfere with the defendant's trial rights.  Id.  In addressing the impact of a medication's side effects on a defendant's trial rights, Sell cites Justice Kennedy's concurring

---

[15] As the Court explained in Note 12, supra, three hours before the October 10, 2008 hearing, the Government hand-delivered to the Court a Reply Brief containing a citation to an article published in the Journal of the American Academy of Psychiatry and the Law which had not been cited in the Butner Report.  Contrary to the Government's suggestion in its Reply Brief, that article, Bryon L. Herbel et al., Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder, 35 J. Am. Acad. Psychiatry Law 47 (2007), was not cited in the Butner Report, and is not in evidence.

Even if the Court were to consider this article, however, it would not undermine the Court's conclusion that the Government has failed to demonstrate by clear and convincing evidence that the administration of Haldol is substantially likely to restore Mr. Moruzin's competence to stand trial.  While the authors of the article reported strong success rates for restoring delusional defendants to competency through the administration of antipsychotic drugs, the article does not appear to offer a promising prognosis for patients with Mr. Moruzin's particular constellation of risk factors.  In particular, the article suggests that the drugs work less effectively for patients with a long history of untreated serious mental illness, a long history of drug abuse, and persecutory ideations.  The Court also harbors reservations about aspects of the study's methodology, including the apparent absence of internal statistical controls and the fact that the study was not performed in a double-blind fashion; because the article was not cited in the Butner Report, Defendant was not able to question Dr. Lucking about these methodological shortcomings at the June 2, 2008 hearing.

opinion in <u>Riggins v. Nevada</u>, which in turn explains that

antipsychotic drugs

> can prejudice the accused in two principal ways: (1) by
> altering his demeanor in a manner that will prejudice his
> reactions and presentation in the courtroom, and (2) by
> rendering him unable or unwilling to assist counsel . .
> . .
>
> The side effects of antipsychotic drugs may alter
> demeanor in a way that will prejudice all facets of the
> defense.  Serious due process concerns are implicated
> when the State manipulates the evidence in this way.  The
> defendant may be restless and unable to sit still.  The
> drugs can induce a condition called Parkinsonism, which,
> like Parkinson's disease, is characterized by tremor of
> the limbs, diminished range of facial expression, or
> slowed movements and speech . . . .
>
> These potential side effects would be disturbing for any
> patient; but when the patient is a criminal defendant who
> is going to stand trial, the documented probability of
> side effects seems to me to render involuntary
> administration of the drugs by prosecuting officials
> unacceptable absent a showing by the State that the side
> effects will not alter the defendant's reactions or
> diminish his capacity to assist counsel.

<u>Riggins</u>, 504 U.S. at 142-43 (Kennedy, J., concurring in the

judgment) (citations omitted).[16]  These concerns for the

potential unfairness to an individual, like Mr. Moruzin, who also

harbors strong persecution ideations, should likewise not be

understated.

---

[16]  While <u>Sell</u> refers expressly only to the defendant's
ability to assist counsel, it cites the entirety of the
concurring opinion, including those pages in which Justice
Kennedy addresses the prejudice created by altering a defendant's
courtroom demeanor.  <u>See</u> <u>Sell</u>, 539 U.S. at 180.

The Government has not established by clear and convincing evidence that side effects likely to alter Mr. Moruzin's demeanor in a manner that may "prejudice his reactions and presentation in the courtroom," id., are substantially unlikely to result from the administration of Haldol.[17]  While Dr. Lucking testified that the pseudo-Parkinson's-type side effects and akathisia caused by Haldol and referenced in Riggins can be "easily treated," (Tr. at 41), he testified that tardive dyskinesia, which occurs in twenty percent of patients taking Haldol, cannot be treated.  (Id. at 90.)  The symptoms of dyskinesia – "repetitive, involuntary, purposeless movements," such as "grimacing, tongue protrusion, lip smacking, puckering, and pursing of the lips and rapid eye blinking," (id.) – would manifestly affect Mr. Moruzin's "demeanor in a manner that [could] prejudice his reactions and presentation in the courtroom."  Riggins, 504 U.S. at 142.  While less common among patients taking Haldol than dyskinesia, the more severe side effects of the medication, including dystonia

_____

[17]  It bears noting that the Court is not expressing any opinion about the likely impact of antipsychotic agents apart from Haldol on Mr. Moruzin's condition.  Indeed, Dr. Lucking testified that a wide range of antipsychotic drugs exists, but that the need to administer such drugs involuntarily through long-acting injections sharply decreases the treatment options available.  (Tr. at 27, 36.)  It would be a welcome day if Mr. Moruzin would be amenable to voluntary treatment, as he indicated that he might be willing to consider at the October 10, 2008 hearing; if Mr. Moruzin is willing to take the drugs voluntarily, it may well be that the expanded universe of available drugs would include more effective medications with less serious side effects.

and neuroleptic malignant syndrome, would likewise have an impact on Mr. Moruzin's courtroom presentation.

In short, the evidence in the record fails to establish by clear and convincing evidence that the administration of Haldol would significantly further the Government's interest in restoring Mr. Moruzin's competency without potentially impacting his trial rights.  Sell, 539 U.S. at 180.  Dr. Lucking's failure to account for the negative prognostic signs in Mr. Moruzin's case in evaluating the likely impact of Haldol on his psychosis, and the evidence of potential side effects reviewed above, cast such doubt that the evidence cannot be considered clear and convincing.

    3.  Alternative Treatments

Sell's third consideration, the necessity of the treatment proposed, requires the Court to "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results."  Id. at 181.  This factor calls upon the Court to explore whether "nondrug therapies may be effective in restoring [the defendant] to competence."[18]  Id.  As to this factor, the

_____

[18]  In Sell, the Supreme Court further called upon courts to "consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods."  Sell, 539 U.S. at 181.  It is abundantly apparent that such an order would have no impact on Defendant's willingness to take antipsychotic medication.  The Butner Report, and Mr. Moruzin's statements throughout the proceedings herein, make clear that the paranoia that prevents him from being able to cooperate with his attorney

Court again finds that the Government has failed to carry its burden by clear and convincing evidence.

It is true, as the Government argues, that Dr. Lucking opined that "there is no alternative" to the involuntary administration of antipsychotic drugs to restore Mr. Moruzin to competency.  (Tr. at 64.)  The Court agrees with Defendant, however, that the persuasiveness of Dr. Lucking's testimony on this point was undermined by two considerations.  First, the Court finds that there is a tension between Dr. Lucking's opinion that there are no alternative treatments that could effectively address Mr. Moruzin's illness, on the one hand, and his testimony about the potential effect of mood stabilizing medications on Mr. Moruzin's competency on the other.  Dr. Lucking testified that although it is Mr. Moruzin's paranoia, not his bipolar disorder, that prevents him from being competent to stand trial, (id. at 23), the mood swings caused by his bipolar disorder "act to intensify underlying psychotic symptoms or paranoia."  (Id. at 26.)  In view of Dr. Lucking's statement that a defendant could be competent to stand trial even if he had mild psychotic symptoms, (id. at 23), and the implication from his testimony that mood stabilizing drugs targeting Defendant's mood swings would decrease the intensity of his psychotic symptoms, the Court

---

extends to a belief that the Court is involved in a conspiracy against him.  (Gov't's Br. Ex. B at 10-11.)

cannot conclude that "alternative, less intrusive treatments" that could restore Mr. Moruzin's competence are unavailable in this case.  Sell, 539 U.S. at 181.  Mr. Moruzin has repeatedly indicated he is willing to take mood stabilizing medication, and that such medication has helped him in the past.  Because, as Dr. Lucking testified, a mood stabilizing drug could tame Mr. Moruzin's mood swings and diminish the intensity of his paranoia, the Court is not persuaded that alternative, less intrusive therapies are unavailable here.

Additionally, the Court finds that Dr. Lucking's dismissal of the potential impact that psychotherapy might have upon Mr. Moruzin's competence to stand trial was based on an incorrect factual premise, further undercutting the Government's suggestion that forced medication is the only available course in this case. The Butner Report's conclusion regarding the inappropriateness of psychotherapy in Mr. Moruzin's case is based in part on the premise that "Mr. Moruzin does not have any insight/understanding that he has a mental illness . . . [and,] therefore, does not believe he is in need of treatment of any type."  (Gov't's Br. Ex. B at 14.)  At the June 2, 2008 hearing, Dr. Lucking testified that he was unaware of the fact that Mr. Moruzin "has acknowledged he has had mental illness in the courtroom on multiple occasions" and conceded that it might be appropriate to try psychotherapy "depend[ing] upon what type of mental illness

33

he admits to having." (Tr. at 80.)  Mr. Moruzin has demonstrated an awareness of his illness, including the fact that he suffers from delusions, on numerous occasions in the proceedings herein, including, most recently, at the October 10, 2008 hearing.

The Court acknowledges the prevailing medical belief that psychotherapy combined with mood stabilizers is not the indicated treatment for a psychotic disorder.  The relevant comparison for present purposes, however, is not the general efficacy of anti-psychotic medications vs. mood stabilizers and psychotherapy, but rather the specific factors that might lead to a positive prognosis in Mr. Moruzin's case.  Where the prognostic factors for the involuntary administration of Haldol and its side-effects are generally negative in Mr. Moruzin's case, the Court cannot say that the prospects of success with voluntary mood stabilizers and psychotherapy in achieving the necessary degree of competency to stand trial are so insubstantial as to be disregarded as a therapeutic alternative.

Based on Dr. Lucking's own testimony, then, and the inaccurate factual premises underlying the discussion of psychotherapy in the Butner Report, the Court finds that the Government has not sustained its burden of proving by clear and convincing evidence that "nondrug therapies [would not] be effective in restoring [Defendant] to competence." Sell, 539 U.S. at 181.

34

4.  <u>Medical Appropriateness</u>

The final <u>Sell</u> factor requires the Court to determine whether the proposed treatment is "<u>medically appropriate</u>, i.e., in the patient's best medical interest in light of his medical condition." <u>Id.</u> (emphasis in original).  As the Court explained in <u>Sell</u>, "[t]he specific kinds of drugs at issue may matter here as elsewhere.  Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." <u>Id.</u>

The concerns discussed <u>supra</u> regarding the efficacy of the proposed treatment in this case likewise demonstrate that the Government has not carried its burden under this final <u>Sell</u> prong.  While Dr. Lucking expressed his opinion in the Butner Report and during the June 2, 2008 hearing that the involuntary administration of antipsychotic agents in this case is "medically and clinically appropriate," (Gov't's Br. Ex. B at 15), his failure to adequately account for the array of negative prognostic signs in Mr. Moruzin's case undermines the persuasiveness of his testimony.  Simply put, Mr. Moruzin's age, lifetime of drug abuse, and long history of severe, untreated mental illness all cast doubt upon the likely impact of Haldol – as Dr. Lucking himself concedes.  (Tr. at 56-59.)  Dr. Lucking's characterization of the prognostic signs in this case as collectively being neutral-to-positive, when every prognostic

sign he raised appears to diminish the likely impact of Haldol in Mr. Moruzin's case, is not credible. It is, in theory, conceivable that there exists an array of countervailing positive prognostic signs that "trump" all of these negative indicators, but the Butner Report and Dr. Lucking's testimony did not address any, and cannot be considered clear and convincing evidence on this point.

Additionally, "the risk of Defendant suffering serious side effects is not insubstantial," which bears upon the medical appropriateness inquiry. McCray, 474 F. Supp. 2d at 682. While Dr. Lucking testified that in his practice, he encounters the "easily treated" extrapyramidal side effects of Haldol at a rate far short of the frequency reported in the medical literature, (Tr. at 41-42), his testimony indicates that untreatable side effects, such as tardive dyskinesia, occur in twenty percent of Haldol patients, (id. at 90), and that potentially fatal side effects, including dystonia and neuroleptic malignant syndrome, while much less common, can result from the administration of Haldol. (Id. at 94, 97.) "When the risks of serious side effects are balanced against the questions that exist affecting the potential effectiveness of drug treatment, the Court cannot conclude by clear and convincing evidence that the potential benefits that outweigh the substantial risks." McCray, 474 F. Supp. 2d at 682.

36

## IV. CONCLUSION

For the reasons set forth above, the Court will deny the Government's <u>Sell</u> motion.  Defendant, who is not dangerous to himself or others, "has a constitutionally protected liberty interest in avoiding involuntary administration of antipsychotic drugs – an interest that only an essential or overriding state interest might overcome."  <u>Sell</u>, 539 U.S. at 178-79 (internal quotations and citations omitted).  The Government has failed to satisfy its burden under <u>Sell</u> of establishing by clear and convincing evidence that the proposed "treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests."  <u>Id.</u> at 179.  The denial of this motion for involuntary administration of antipsychotic medication is without prejudice to renewal if circumstances significantly change.  The Government's motion will accordingly be denied.  The accompanying Order will be entered.


**October 30, 2008**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         United States District Judge

37